IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL SCHWARZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 08 C 5019 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| LOYOLA UNIVERSITY MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Daniel Schwarz ("Schwarz") filed a seven-count amended complaint [6] against Defendant Loyola University Medical Center ("Loyola") alleging discriminatory employment practices. Before the Court is Loyola's motion for summary judgment [111]. For the reasons explained below, the Court grants summary judgment for Loyola and against Schwarz on the Americans with Disability claims and dismisses the remaining counts without prejudice to re-filing in state court. The case is terminated and judgment is entered in favor of Defendant Loyola on the ADA's counts.

I. **Background**[1]

A. **Facts**

Plaintiff Daniel Schwarz is a licensed physician who has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). Schwarz commenced and completed his general surgery residency at the Medical College of Ohio between July 1988 and June 1993. He began a

---

[1] The Court takes all relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements: Defendant's Statement of Facts ("Def. SOF") [113], Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp.") [142], Plaintiff's Statement of Additional Facts ("Pl. SOAF") [143], and Defendant's Response to the Plaintiff's Statement of Additional Facts (Def. Resp.) [147].

plastic surgery residency at the University of Michigan in July 1993, but was terminated from the program prior to its completion in October 1996 for performance and behavior issues. Plaintiff was a trauma surgeon at St. Vincent's Medical Center in Toledo, Ohio between September 1993 and July 1999, although he testified that his last trauma call at St. Vincent's was in November 1997. Between 1997 and 2006, Plaintiff did not treat any patients. Rather, he was employed as a financial consultant/loan officer between 1998-2004. He returned to the University of Michigan as a research fellow in June 2004.

In February 2006, Schwarz submitted an application to the Plastic Surgery Central Application Service, which matched him with Loyola's plastic surgery residency program. In his personal statement submitted with his application, Schwarz stated that he was terminated from the University of Michigan "for reasons I created" and testified that those reasons were "behaviors secondary to [his] undiagnosed, untreated ADHD and alcoholism." Pl. Resp. ¶ 7. In his statement, he also stated that he had "completely rectified the issues that contributed to [his] release." He supported his application with letters of recommendation making the same assertions.[2]

In considering Schwarz's application for a plastic surgery resident position, some Loyola personnel expressed concern about the circumstances that led to Schwarz's termination from the University of Michigan as well as concern about Schwarz's absence from clinical practice for some time. Pl. Resp. ¶ 13. It was determined that Schwarz would be admitted into the plastic surgery residency program conditional upon his successful completion of a three month period working in the Burn Unit under the supervision of Dr. Gamelli. At that time, Dr. Gamelli was

---

[2] One of those letters, from Dr. Steven Buchman at the University of Michigan, observed that Plaintiff's difficulties "were not compatible with the rigors and demands essential to both fulfill the requirements of residency or to move on professionally as a proficient practitioner." Conversely, Dr. Buchman did state that Plaintiff's laboratory work was "remarkable."

the chairman of the Department of Surgery and Director of the Burn Unit. Pl. Resp. ¶ 14. Dr. Gamelli testified that he intended for Schwarz to have a "warm-up" period to "prove that [Schwarz] had the capacity to the work and that he was fit for duty."

On May 11, 2006, Dr. Cimino, Assistant Professor in the Division of Plastic Reconstructive Surgery at Loyola, discussed with Schwarz the proposed plan of action and conditions to his employment in the plastic surgery residency program. Pl. Resp. ¶ 15. The day of this conversation with Dr. Cimino, Schwarz signed a letter advising him that he had been provisionally accepted into the plastic surgery residency program at Loyola upon the condition that he complete "a three-month period of re-integration into clinical work" and participate in a mentorship program. Pl. Resp. ¶ 17.

On September 1, 2006, Loyola and Schwarz executed a Graduate Medical Education Agreement ("Agreement"). This Agreement includes the provision under the heading "Remediation Provision," which states:

> The Resident understands and hereby acknowledges that upon receipt of Illinois medical licensure, but prior to participating in resident rotations required by PGY-7 plastic surgery residents, he will be assigned to a non-accredited general surgery rotation where he will receive training under the direct supervision of the Chairman of the Department of Surgery for a period of time not to exceed three months. The Resident further understands and hereby acknowledges that he will not receive credit toward graduation and/or certification for the time spent in the general surgical rotation. Upon successful completion of this non-accredited general surgical training, the Resident shall begin his participation in the plastic surgery residency program where he will be eligible to receive credit toward graduation and/or certification. If the Resident does not successfully compete the general surgical training, he will not be permitted to participate in the plastic surgery residency-training program and this Agreement shall terminate immediately.

Pl. Resp. ¶ 18.

Prior to executing the agreement, Plaintiff responded to his receipt of the agreement in an e-mail to Dr. Dado and Kim Echert dated July 21, 2006, for which he put the heading "Contract

great-everything go!" and stated: "Thank you all for the consideration and detail with my contract * * * the non-accredited Genl Surgery is a great benefit: it may allow me to be eligible for recertification of my General Surgery Boards. Every aspect of what you have considered and provided has worked out well for all parties. I am grateful." See Plaintiff Dep. Ex. 11. In the e-mail, Dr. Schwarz also indicated he would defer to Dr. Doot and GME to make adjustments regarding the "proactive random monitoring agreement." In an August 17, 2006 e-mail to Dr. Dado, Residency Program Director for the Division of Plastic and Reconstructive Surgery, Schwarz stated that he was having some issues with logistics (moving from Michigan and "cleaning up prior matters:"), however he stated "***Once I start Sept 1, this will be a COMPLETELY closed book. I will NOT have any unfinished items; will be up-to-date, and will NOT have any excuses or reasons to prevent me from being the best resident." Pl. Resp. ¶ 21. Plaintiff left his home in Michigan to move to Chicago, Illinois at approximately 3:00 p.m. on August 31, 2006 with plans to begin working at Loyola on 8:00 a.m. the following day. Pl. Resp. ¶ 22. After beginning his employment at Loyola, Schwarz continued to assist students at the University of Michigan and continued to work on completing his federal tax returns from prior years. Pl. Resp. ¶ 24.

Several doctors at Loyola testified that, from the beginning of Schwarz's employment at Loyola, Schwarz' lack of promptness concerned them. A memo from Dr. Brewster, the chief resident in the Burn Unit while Schwarz was working there, noted that Schwarz did not demonstrate promptness in responding to pagers. Pl. Resp. ¶ 25. Additionally, a first year resident in the general surgery training, Dr. Gresik, testified that Plaintiff was frequently late to work. Pl. Resp. ¶ 26. She further testified that Plaintiff did not participate in doing all of the work that the other residents in the Burn Unit did, forcing the other residents to work more.

Schwarz contests the factual basis for these statements. Pl. Resp. ¶ 26. However, Schwarz testified "there may have been a couple of pages I wasn't able to immediately address." Pl. Resp. ¶ 25.

Schwarz's interactions with doctors and hospital staff also were a documented concern. Dr. Gresik testified that Schwarz yelled over her during rounds several times. She also testified that Schwarz yelled defensively to Dr. Brewster about "an excuse or incorrect information about what was going on with the patient" and that this impaired the ability of the team to continue rounds. Pl. Resp. ¶ 28. Schwarz denies the frequency that Dr. Gresik alleges but acknowledges two instances in which he raised his voice while working. Pl. Resp. ¶ 28.

Loyola made certain accommodations in an attempt to work with Plaintiff. On Schwarz's first night for in-house call, Dr. Brewster stayed with him. Pl. Resp. ¶ 32. Additionally, Dr. Brewster met with Schwarz in the mornings after nights that Schwarz was on call to confer with him regarding his performance. Pl. Resp. ¶ 32. Schwarz's patient load (when he was not on call) also was reduced. Despite the accommodations, Dr. Brewster testified that Schwarz's performance did not improve. On September 19, 2006, Dr. Brewster provided Dr. Gamelli with a written report opposing Plaintiff's continued residency training. Dr. Brewster testified that Plaintiff failed in his interpersonal relationships with other healthcare providers and engaged in emotionally charged and unprofessional acts such as arguing with nurses, being absent from the unit, not returning calls, and blaming others for patients doing poorly. Dr. Gamelli also received reports of Plaintiff's behavior from nurses in the Burn Unit. The incidents reported included an unexplained delay in responding to a page to examine a bleeding patient; arguing with nurses who questioned the appropriateness of medication orders that Plaintiff gave; calling a female patient care technician a demeaning name; making an inappropriate comment to a patient; and

confronting a nurse about treatment in front of a patient.  Plaintiff admits to being "less than perfect," but disputes that his unprofessional behavior extended beyond a few isolated incidents. In addition, Dr. Gamelli personally observed Plaintiff's behavior and felt that Plaintiff's self-control was poor, and wholly inadequate in times of relatively mild stress, and that Plaintiff's interpersonal skills were far below the expectations of a medical professional.

Dr. Gamelli ultimately concluded that "the demands and expectations of a physician/surgeon exceed that which [Plaintiff] is capable of meeting" and that for Plaintiff to continue in the training program "is simply not fair to him, to the program or to the patients that he would have primary decision-making responsibility."  Dr. Gamelli terminated Plaintiff's employment by letter dated September 22, 2006.  The letter stated that Plaintiff demonstrated poor clinical knowledge and judgment and that attempts to assist him went unheeded.  The letter additionally stated that staff members raised concerns almost daily about Plaintiff's inappropriate behavior, including demeaning and derogatory comments directed toward hospital staff members, and that, despite attempts to address Plaintiff's interpersonal skills, the inappropriate behavior continued.  The letter further stated that Plaintiff's conduct had undermined his credibility and compromised patient care.  Plaintiff was advised that he was being terminated for failure to provide safe, effective, and compassionate patient care commensurate with his level of advancement and responsibility; harassment or abuse of other hospital staff; and repetitive unprofessional conduct.  Although Plaintiff had been employed by Loyola for less than a month, payment was tendered to him for the entire three-month period that he could have been in the general surgery residency rotation.  Plaintiff appealed his termination and a grievance hearing was held on November 7, 2006.  The Grievance Committee, followed by the Dean of the Stritch School of Medicine, upheld Plaintiff's termination.

In his sworn interrogatory answers in this action, Plaintiff set forth the life activities that are impacted by his ADHD:

> My specific disabling conditions include symptoms commonly found in Attention Deficit Hyperactivity Disorder (ADHD), general anxiety disorder, substance use disorder, among others. Major life activities that I am limited in performing include verbal cognition, sleeping, social interaction, maintaining and forming relationships, communication, short term memory, attention, perception, impulsive behavior, concentration with distractions, reading comprehension, scheduling, completing tasks, taking care of personal needs, eating, requesting clarification, responding appropriately to negative feedback, maintaining stamina, among others. As with anyone suffering from ADHD, my medication provided some relief and control, however, a number of major life activities impacted by my ADHD are still impaired even while on medication. Each of these limitations become heightened or significantly more severe when I am sleep deprived or unable to take medications.
>
> My disability impacts/impacted these activities in the following ways: I need to write down instructions and ask multiple questions for clarity; I cannot sleep because my mind races; distractions prevent my ability to focus on a task and complete it; I need to re-read books and must memorize them. I require meticulous lists to complete common daily tasks, life grocery shopping, paying bills, opening mail, completing chores and eating. I am often misunderstood by my peers and I find myself rambling on and on; I require a structured environment with specific goals and tasks; I sometimes "freeze" or am unable to comprehend a situation; I am always "rushing"; I am sometimes perceived as absent minded; and I require reminders to set alarms to keep my schedule. Investigation continues.

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. And the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id*. Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

III.     **Analysis**

Plaintiff alleges that Loyola's termination of his employment as a surgical resident constituted discrimination based on his alleged disability, Attention Deficit Hyperactivity Disorder ("ADHD"), in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  Loyola contends that summary judgment on Plaintiff's five federal claims is appropriate because Plaintiff is not a qualified individual with a disability under the ADA for two reasons:  (1) Plaintiff could not perform the essential functions of a surgical resident with or without reasonable accommodation, as demonstrated by his performance and behavior; and (2) the ADA provides no bar to discipline for employee misconduct.  Defendant also maintains that Plaintiff has failed to develop any factual or legal support for his state law claims for retaliatory discharge and defamation.

A.     **The ADA Claims**

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1). Two distinct types of discrimination are encompassed within the ADA.  *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021 (1997).  First, discrimination means treating "a qualified individual with a disability" differently because of the disability.  *Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996).  This is sometimes referred to as disparate treatment.  *Id.*  (a claim "that other employees who were not disabled were treated more favorably * * * [is a] claim for disparate treatment").  Second, a separate claim of discrimination can be alleged under the ADA for failing to provide reasonable accommodation.  *Sieberns*, 125 F.3d at 1022; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996)

("Unlawful discrimination under the ADA includes both discriminatory discharge and the failure to provide reasonable accommodation.").

Plaintiff's argument encompasses both theories of discrimination.[3]  However, regardless of the type of discrimination alleged, Plaintiff must first establish that he was a "qualified individual with a disability."  See *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008); *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001).  The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); see also *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006) (to make out a prima facie case, a plaintiff must show that he suffers from a "disability," is qualified to perform the essential functions of the job in question with or without reasonable accommodation, and has suffered an adverse employment action as a result of his disability).[4] The plaintiff bears the burden of proof on the issue of whether he is a "qualified individual" under the ADA.  *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998).  Therefore, if no reasonable trier of fact could find that Plaintiff was capable of performing the essential functions of his position at Loyola, with or without reasonable accommodation, then Plaintiff is not a qualified individual under the ADA and summary judgment must be granted.

---

[3]   At the outset of his memorandum in opposition to Defendant's motion for summary judgment, Plaintiff states that his "primary claim[] in this litigation" is that Loyola discriminated against him by purportedly changing its offer of employment to require him to initially successfully complete a reintegration period. See Pl.'s Opp. at 1.  To the extent that is Plaintiff's allegation in this case, it was rejected by the Court in denying Plaintiff's motion for leave to file a second amended complaint:  "What Plaintiff fails to acknowledge is that the May letter * * * 'provisionally' accepted him into the Program, subject to the condition that he participate in a three-month period for reintegration into clinical work."  [99 at 5.]  The contract that Plaintiff negotiated and signed is explicit on this point, and therefore Plaintiff's "primary claim" has no merit.

[4]   The same standards apply to determine whether the Rehabilitation Act has been violated in the employment context.  See *Jackson v. City of Chicago*, 414 F.3d 806, 810-11 (7th Cir. 2005).

Plaintiff's ADA claims center on Plaintiff's allegation that he should have been provided "a slow gradual warmup period." Pl.'s Opp. at 3. However, even accepting Plaintiff's contention that he has a disability, Defendant has put forth sufficient evidence that Plaintiff cannot perform the essential functions of surgical resident with or without reasonable accommodation and Plaintiff has failed to rebut this evidence with sufficient evidence of his own. The undisputed facts before the Court depict Plaintiff's position in the Burn Unit as requiring interpersonal skills, organization, and the ability to provide safe and appropriate care for patients. The overwhelming evidence demonstrates that Plaintiff was unable to perform these functions. The nature and extent of Plaintiff's disabilities set forth in his own interrogatory answers demonstrate that he cannot meet the demands of a surgical resident, much less a practicing surgeon operating without the patient care safeguards built into a residency program. In addition to the limitations set forth by Plaintiff, Defendant's surgical training program expert opined on Plaintiff's self-proclaimed limitations:

> Dr. Schwarz states, in his answers to defendant's interrogatories, that he is limited in performing verbal cognition, social interaction, maintaining and forming relationships, communication, short term memory, attention, perception, concentrating with any distractions, reading comprehension, scheduling, completing tasks and maintaining stamina, among others. In addition, he states that he is prone to impulsive behavior. He is by his own admission not qualified to train as a surgeon. I would tell you as a training surgeon that serious deficits in any one or two, or arguably three of these qualities would be enough to prohibit someone from training successfully as a surgeon in particular, maybe as a physician at all. If stress, fatigue, long and unpredictable hours, or unexpected problems can cause a lapse into adverse behaviors, then a medical career is inappropriate * * * * Regardless, for the hospital and its patients, Dr. Gamelli is obligated to ensure that patients and staff are not subjected to the uncontrolled behavior and poor performance that Dr. Schwarz exhibited.

Furthermore, one of Plaintiff's own witnesses, Dr. William Kuzon, the current Section Head for Plastic Surgery at University of Michigan, testified that he did not believe Loyola's assignment of Plaintiff to the Burn Unit was inappropriate:

> There is this basic tenet of clinical medicine that you can do it or you can't * * * And so if you're going to enter into a clinical medical training program and you're prepared to enter into that clinical training program * * * you should be able to handle any rotation, that you shouldn't need to sort of, quote, 'ease into it somehow' * * * because you're either above the line or you're not.

Def. Ex. 10, Kuzon Dep. at 69:18-70:12.

On top of Plaintiff's admissions and the experts' opinions, neither Dr. Gamelli (Chairman of the Department of Surgery) nor Dr. Brewster (chief resident on the Burn Unit) believed that Plaintiff was able to provide safe and effective patient care, with or without accommodation. Plaintiff concedes that his re-entry into clinical work was to be personally monitored and evaluated by Dr. Gamelli. Pl.'s Opp. at 4. It is undisputed that Dr. Gamelli worked with Plaintiff, and that he assessed Plaintiff's knowledge, judgment and reasoning to be insufficient. Although Plaintiff disagrees with Dr. Gamelli's assessment, there is no dispute that Dr. Gamelli found Plaintiff's performance to be sub-par. It also is undisputed that Dr. Brewster advised Dr. Gamelli that he believed that Plaintiff's medical knowledge and clinical judgment were deficient in areas critical to patient care and that Plaintiff's performance did not improve despite the accommodations afforded him. Again, while Plaintiff disagrees, his supervisors did not believe that he could perform the essential functions of a surgical resident with or without accommodation. In Dr. Gamelli's words, "the demands and expectations of a physician surgeon exceed that which [Plaintiff] is capable of meeting." Dr. Brewster concluded: "I could not help Danny improve, and that this was who he was and sufficient for him not to be recommended for continued employment or training. Not to do so would endanger patients during his training and after his training." Dr. Brewster and Dr. Gamelli were charged with making judgment calls about residents, and there is no basis for suggesting or inferring that their assessments of Plaintiff's abilities—in terms of his capabilities as a *surgical* resident—reflect a discriminatory

animus.    Dr. Gamelli—who bore the ultimate responsibility for evaluating Plaintiff's performance and determining whether he had the necessary skill, judgment, and professionalism to move on in his training as a plastic surgeon—did not believe Plaintiff was qualified to do so, and Plaintiff has failed to present any evidence—beyond his own opinion—that he was qualified.

A recent Fourth Circuit decision supports Dr. Gamelli's decision.  In *Shin v. University of Maryland Medical System*, 369 Fed. Appx. 472 (4th Cir. 2010), the plaintiff was a resident physician with possible ADHD who sought a reduced workload.  Based on the undisputed fact that one of the essential functions of the plaintiff's position as a hospital resident was to "provide safe and appropriate care for patients," the district court determined that the plaintiff could not perform the essential functions of his position with or without reasonable accommodation.  As in this case, in *Shin*, the plaintiff's supervisors believed that the plaintiff exercised poor judgment in critical situations, failed to check on changes in patients' conditions, and required constant supervision.  The Fourth Circuit affirmed summary judgment, concluding that "no reasonable jury could find that, while at UNMSC, Dr. Shin provided safe and appropriate care for patients with efficiency and reasonable autonomy."  *Id.* at 481; see also *Jakubowski v. Christ Hospital*, 627 F.3d 195 (6th Cir. 2010) (upholding summary judgment in favor of hospital against a resident physician who had Asperger's disorder and concluding that no reasonable accommodations existed that would not pose an undue hardship on the hospital and/or a direct threat to patient care).  Based on the record in this case, the same can be said of Dr. Schwarz.[5]

---

[5]    The Fourth Circuit also upheld the district court's determination that Dr. Shin's proposed accommodations were not reasonable: "the ADA does not require an employer to assign an employee to permanent light duty * * * nor does it require an employer to reallocate job duties in order to change the essential functions of a job."  *Id.* at 482.  In that regard, the workload reduction that Dr. Shin sought was in direct conflict with the residency educational goals designed to develop competency, which require doctors to function at a level allowing complex problem solving, including simultaneously managing multiple patient care situations and dealing with ambiguity.  In noting those considerations, the Fourth

The other basis for Plaintiff's termination was his inappropriate and unprofessional behavior. In is undisputed that Dr. Gamelli received reports about Plaintiff's behavior from Dr. Brewster, from the head nurse for the Burn Unit, Jeanie Leggett, and from other members of the Burn Unit nursing staff. In addition, Dr. Gamelli independently observed Plaintiff's inappropriate interactions with nurses, patients, students, resident staff and other members of the Burn Team:

> What struck me about Dr. Schwarz was the continuous turmoil that seemed to exist in his inner-personal relationships with various members of the team. There were always actions that he was attempting to explain and attempting to have them seen in another light; other than the light of reality. There was frequently a need to apologize for things that had been said or done. Only in hindsight did he seem to have some recognition of their inappropriateness * * * * His self-control is poor at best and at times of relatively mild stress, it is wholly inadequate. His ability for introspection and reflection is minimal * * * * His interpersonal skills are simply way below the expectation of a professional and certainly that of a physician.

Gamelli Dep. Ex. A, p. 2; Gamelli Dep. at 154: 13-157:8.

Plaintiff concedes that his behavior was "less than perfect" (Pl.'s Opp. at 6), but he attributes his behavior to an unsuccessful effort to reduce his hours and to fatigue from purportedly having to work more than 80 hours per week in some weeks. However, whether Plaintiff attributes his behavior to a disability or to the number of hours he worked, or to displeasure over being required to do a reintegration into clinical practice after being absent from the profession for several years, is of no moment, because the ADA provides no bar to discipline for misconduct. *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001). Furthermore, Defendant has presented expert testimony that the ability to effectively communicate with professional colleagues is essential to safe patient care, and Plaintiff has not refuted Defendant's

---

Circuit expressed reluctance to substitute its judgment on the standards for professional and academic achievement. This Court echoes the Fourth Circuit's views, which apply equally in this case.

evidence or demonstrated that he was able to perform this function to the satisfaction of his supervisors.[6]

The undisputed facts demonstrate that Dr. Gamelli made the decision to terminate Plaintiff's employment based on his assessment that Plaintiff failed to provide safe and effective patient care, and engaged in unprofessional conduct including harassment and abuse of other hospital staff. Plaintiff can disagree with that decision, but he has not submitted any evidence that Dr. Gamelli made his decision on any other basis. To show pretext, a plaintiff must show more than that the defendant's decision was "mistaken, ill considered or foolish" and as long as the employer honestly believes those reasons, pretext has not been shown. *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (affirming summary judgment on the plaintiff physician's ADA claims); see also *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). Here, Plaintiff relies upon his unsupported speculation that he was terminated because "they thought he was on drugs" (Pl.'s Opp. at 6), but Plaintiff has not presented any evidence that Dr. Gamelli had any such concerns. Furthermore, neither Dr. Brewster nor the nurses who reported to Dr. Gamelli on Plaintiff's performance and behavior expressed any such concern. Rather, Dr. Gamelli's focus was on Plaintiff's ability to "attest to his clinical skills, judgment and

---

[6]  Notably, Plaintiff's misbehavior disqualifying him as an individual with a disability under the ADA is further evidenced by his employment history subsequent to Loyola. One of Plaintiff's subsequent employers required him to sign a form after he had been working there for over a year, agreeing to interact with all staff in a professional and respectful manner and to operate within the hospital's policies and procedures. Plaintiff's employment was terminated shortly thereafter, with instructions to not return during the three-month notice period. Another employment relationship ended after just one month, and the employer testified that he would have fired Plaintiff if they had been unable to reach a mutual agreement for the employment to end. Still another employer testified that he believed Plaintiff's professional judgment, performance, and behavior endangered patient safety, and he reported Plaintiff to the Michigan Board of Medicine. In the three years between August 2007-August 2010, Plaintiff held 10 different employment positions. Although the Court's conclusions in this case are based on the fact that Plaintiff failed to demonstrate that he was qualified for the position of a surgical resident at Loyola (with or without reasonable accommodations)—and not on what transpired after Plaintiff left Loyola—this history is consistent with Loyola's assessment of whether Plaintiff ever was (or is) capable of performing in accordance with LUMC's legitimate job requirements.

compatibility to our program." A reasonable fact-finder could not possibly infer that Loyola "hastily discharged Plaintiff because they feared he had relapsed" into substance abuse (Pl.'s Opp. at 6) because there is no evidence upon which any such inference could be made. As the Seventh Circuit has stated: "[O]ur favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.' Thus, we have explained that the nonmoving party 'must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial.'" *Argyropoulos v. City of Alton*, 359 F.3d 724, 732 (7th Cir. 2008). The mere fact that Loyola was aware that Plaintiff had a substance abuse problem at some point in the past is not evidence that it regarded him as disabled. See, *e.g.*, *Tate v. Illinois Workers' Compensation Commission*, 2011 WL 1738575, at *6 (N.D. Ill. May 12, 2011) ("Tate fails to appreciate that IWCC's awareness of her medical condition is not sufficient to establish that IWCC believed Tate was disabled or that her medical condition substantially limited her ability to work."). While Dr. Gamelli knew of Plaintiff's prior history of substance abuse, Plaintiff has not presented any evidence that Dr. Gamelli believed Plaintiff had lapsed or was about to lapse. Nor is there any evidence that Dr. Gamelli made his decision to terminate Plaintiff's employment based on anything other than his assessment that Plaintiff lacked the necessary knowledge and judgment to be a surgeon, and exhibited behavior which could not be tolerated.[7]

---

[7]   Plaintiff makes no effort to rebut the cases cited by Loyola in which summary judgment on ADA claims was granted in similar circumstances, *i.e.*, where the defendant hospital terminated the employment of a resident physician for performance and/or behavior problems and the appellate court affirmed the trial court's grant of summary judgment because the plaintiff failed to establish that he was a qualified individual with a disability. See Def. Memo at 9-10; *Shin*, 369 Fed. Appx. 472 (4th Cir. 2010); *Jakubowski*, 627 F.3d 195 (6th Cir. 2010).

In the absence of evidence and case law, Plaintiff makes the argument that pretext can be established by Loyola's purported failure to follow its own progressive discipline policies. The fundamental flaw in this argument is that it is contradicted by evidence, namely that Loyola's policy for "Corrective Disciplinary Action" expressly allows for termination at any stage of the disciplinary process based on the circumstances:

> Initiation of disciplinary action shall be the province of the program director or the Chief of Staff. Residents may be subject to written warning, suspension or termination. Discipline may be progressive, in that it follows the order listed below. However, depending upon the severity of an incident or extenuating circumstances, discipline may begin at any stage, including termination.

Furthermore, Dr. Gamelli testified: "Progressive discipline? This is not about discipline. This is about training * * * * I am trying to determine how if someone is capable of doing the kind of work that a surgeon needs to be capable of doing." Gamelli Dep. at 36:12-16. Defendant has put forth evidence that Plaintiff was not meeting the requirements of his provisional residency program and Plaintiff has not rebutted this evidence with his own evidence demonstrating that this is a lie and that he actually was terminated for discriminatory reasons.[8]

Finally, to the extent that Plaintiff is attempting to proceed on his federal retaliation claim, it fails. The one paragraph devoted to a retaliation claim in Plaintiff's response brief sheds little light on his allegations, but a generous reading of Plaintiff's response suggests that he claims that he was retaliated against for either complaining about the number of hours that he was required to work or requesting that he work fewer hours. The evidence establishes that Dr. Gamelli—who made the decision to end Plaintiff's employment—terminated Plaintiff's employment solely because his inability to handle the rigors of the position and his poor performance and behavior. Furthermore, Plaintiff has not presented any evidence that Dr.

---

[8]  In addition to failing to provide sufficient evidence to rebut Defendant's evidence, Plaintiff's two pages of legal analysis—covering his seven claims—falls well short of the mark.

Gamelli was even aware of any complaints by Plaintiff about his hours. Likewise, Dr. Brewster, who recommended to Dr. Gamelli that Plaintiff's employment be terminated, testified that Plaintiff did not express any concern about the hours that he was working. In other words, neither the person who made the termination decision, Dr. Gamelli, nor the person who recommended that decision be made, Dr. Brewster, was aware of any concern or complaint by Plaintiff about the number of hours he was working. Accordingly, there is no causal link between any complaint that Plaintiff allegedly made about his hours and his termination, and thus no reasonable basis for a fact-finder to infer retaliation on that basis. Thus,. See also *Bodenstab v. Cook County*, 569 F.3d 651, 659 (7th Cir. 1999) (concluding that even if "Bodenstab engaged in protected activities, he did not present sufficient evidence that the defendants fired him because he engaged in those activities").

## B.      State Law Claims

Based on the analysis set forth above, all of Plaintiff's federal claims (Counts I through V, which were brought pursuant to the ADA) are subject to dismissal. Because the Court has granted summary judgment as to the only claims over which it has original jurisdiction, it must now address whether to retain jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3). The Seventh Circuit consistently has stated that "it is well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for

departing from that "usual practice"[9] in this case, the Court dismisses without prejudice the state law claims asserted in Counts VI and VII.

## IV. Conclusion

For the foregoing reasons, the Court grants summary judgment [111] for the Defendant and against Plaintiff on Counts I, II, III, IV, and V. The Court dismisses Counts VI and VII without prejudice to re-filing in state court, if Plaintiff so chooses. This case is terminated and judgment is entered in favor of Defendant on Counts I, II, III, IV and V.

Dated: June 11, 2012

_____

Robert M. Dow, Jr.
United States District Judge

---

[9] In *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County,* 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's complaint. *Wright,* 29 F.3d at 1251. Finally, although Plaintiff's state law claims appear to lack merit, it is not "absolutely clear how the pendent claims can be decided." *Id.*